OPINION
{¶ 1} Lydia M. Hanns ("Lydia"), mother of decedent Shanté Nicole Autry ("Shanté"), appeals from a judgment of the Montgomery County Court of Common Pleas, Probate Division, which held that Shanté's father, Kelvin Autry ("Kelvin"), did not abandon Shanté, that he was entitled to share in Shanté's estate, and that his outstanding child support obligation for Shanté *Page 2 
would be deducted from his share of the estate. Lydia claims that the probate court erred in concluding that Kelvin had not abandoned Shanté. For the following reasons, the probate court's judgment will be affirmed.
 I {¶ 2} Shanté was born on March 27, 1989, to Lydia Hanns and Kelvin Autry, who were married at common law. Due to medical malpractice, Shanté suffered from severe cerebral palsy, and she received a substantial settlement. In 1992, shortly after the settlement, Lydia and Kelvin divorced. On January 2, 2007, Shanté died intestate at the age of seventeen.
 {¶ 3} In May 2007, Lydia signed an affidavit, stating that Kelvin had failed to communicate with, care for, and provide maintenance and support to Shanté for more than one year prior to her death. On June 29, 2007, Keybank National Association, the administrator of Shanté's estate, filed a "complaint for determination of heirs" in the probate court, asserting, based on Lydia's affidavit, that Kelvin had abandoned Shanté and that, under R.C. 2105.10, he was not entitled to inherit from Shanté's estate. Keybank requested a determination as to who was entitled to inherit Shanté's estate and the share to which each heir was entitled.
 {¶ 4} Kelvin denied that he had failed to communicate, care for, and provide support for Shanté, and he asserted that he had not abandoned her. Kelvin alleged that Lydia interfered with his ability to spend time with Shanté, and he requested a hearing on the matter. Following a bench trial, the probate court found the following facts:
 {¶ 5} "Lydia and Kelvin lived in a common law relationship when the decedent, Shanté Nicole Autry (Shanté), was born with physical disabilities and limitations. Pursuant to a malpractice suit and settlement, Shanté received $1,000,000.00 for her injuries. When Shanté *Page 3 
died, she was a minor and her estate contained approximately $600,000.
 {¶ 6} "After the birth of the child, Kelvin took great interest in caring for his daughter, tending to her daily needs and her medical needs during her many surgeries. Subsequently, the pair had another daughter.
 {¶ 7} "Unfortunately, the parents divorced shortly after the settlement. Kelvin was ordered to pay child support. Kelvin worked and paid his support faithfully as it was deducted directly out of his check. Kelvin had back surgery and was off from work for a while during his recuperation. At this time, he did not pay child support. After returning to work, Kelvin was injured in a car accident, a few weeks later and required neck surgery.
 {¶ 8} "As a result of these two surgeries, for the most part, Kelvin has been unable to work since 1999. He is unable to do what he used to do. He applied for Social Security disability and submitted several job applications to the Job Center. He did have a sales job in 2006 and the child support was resumed. Kelvin admits that he is behind in his support for both children in excess of $20,000 each.
 {¶ 9} "Shanté required a special vehicle for transportation. She could not walk so that it was necessary to pick her up. While Kelvin continued his visitation with his younger daughter, he was not able to carry Shanté due to his own injuries and he did not have the necessary vehicle in which to transport her.
 {¶ 10} "1. It was apparent to the Court that the two parents have an acrimonious relationship at best, fueled by Lydia's mother. Lydia did not allow Kelvin to visit with Shanté in her home. Lydia's mother would not allow Kelvin to visit with Shanté in her home. Lydia would only allow Kelvin to pick Shanté up and take her with him, which he was unable to do. *Page 4 
Lydia's mother told her not to allow Shanté to go with Kelvin, if she did not know where they were going.
 {¶ 11} "2. Since Kelvin was not allowed in her home, unless Lydia brought the children to him, gifts piled up and when Lydia was so inclined, she would go pick them up. Lydia was [the] driving force in the relationship that Kelvin had with Shanté and their younger daughter, or as Kelvin put it: `it was her way or the highway'.
 {¶ 12} "3. Lydia told their younger daughter that she could not go with her dad because she did not have her work completed. In other words, Lydia would invent excuses to keep the younger daughter from visiting with Kelvin. Then, in later years the mother told the daughter that she just said those things because the father was not coming. These same tactics were used to prevent Kelvin from seeing Shanté.
 {¶ 13} "It is obvious that some of the problems Lydia had with Kelvin dealt with his relationship with other women. Even after years of being apart, Lydia refused to allow Kelvin's significant other to attend Shanté's funeral. Yet, Lydia turned right around and asked Kelvin to father another child with her. Because Kelvin's significant other had endured years of his being at Lydia's beck and call and then was not allowed to attend the funeral, Kelvin no longer lives with her and does not have a permanent address."
 {¶ 14} The probate court concluded that, although Kelvin had failed to communicate with Shanté within the statutory time limit, his failure to communicate was justified due to significant interference from Lydia. The court further found that, because Kelvin had paid child support in 2006, there was no failure to pay child support for purposes of abandonment. The probate court thus concluded that Kelvin had not abandoned Shanté and that he was entitled to *Page 5 
inherit from her estate. As stated above, his share of Shanté's estate was reduced by his outstanding child support obligation for Shanté.
 {¶ 15} Lydia raises one assignment of error on appeal.
 II {¶ 16} Lydia's sole assignment of error states:
 {¶ 17} "THE TRIAL COURT ERRED IN ITS CONJUNCTIVE APPLICATION OF THE DEFINITION OF `ABANDON' AS SET FORTH IN O.R.C. 2105.1[0](A)(1) WHICH IT USED TO FIND THAT KELVIN AUTRY DID NOT WITHOUT JUSTIFIABLE CAUSE ABANDON HIS DAUGHTER, SHANTE NICOLE AUTRY."
 {¶ 18} In her assignment of error, Lydia cites two reasons why the probate court erred in concluding that Kelvin did not abandon Shanté. First, she asserts that R.C. 2105.10(A)(1) should be read such that either the failure to communicate with the minor child, the failure to care for the child, or the failure to provide maintenance and support is sufficient to constitute abandonment. Lydia argues that, "to do otherwise would allow Kelvin to profit immensely from the mere fact that he successfully allowed child support to be withheld from his wages * * *, notwithstanding the complete lack of [recent] contact with Shanté * * *." Second, Lydia claims that the probate court erred in determining that Kelvin's failure to communicate with Shanté was justified.
 {¶ 19} R.C. 2105.10(B) provides that "a parent who has abandoned his minor child who subsequently dies intestate as a minor shall not inherit the real or personal property of the deceased child * * *." In this context, "abandon" means that the minor's parent "failed without justifiable cause to communicate with the minor, care for [her], and provide for [her] *Page 6 
maintenance or support as required by law or judicial decree for a period of at least one year immediately prior to the date of the death of the minor." R.C. 2105.10(A)(1).
 {¶ 20} Although we have found no case law interpreting R.C. 2105.10(A)(1) — and Lydia has not cited to any authority — we have interpreted R.C. 2125.02(G)(3), which defines "abandoned" for purposes of the wrongful death statute. See In re Wrongful Death of Turner (Nov. 25, 1998), Champaign App. No. 92 CA 2. R.C. 2125.02(G)(3) is virtually identical to R.C. 2105.10(A)(1); it defines "abandoned" as "that a parent of a minor failed without justifiable cause to communicate with the minor, care for the minor, and provide for the maintenance or support of the minor as required by law or judicial decree for a period of at least one year immediately prior to the date of the death of the minor."
 {¶ 21} In Turner, we noted that the definition of "abandonment" in R.C. 2125.02(G)(3) is worded in the conjunctive, and we interpreted that statute, stating: "[I]f the parent has performed any one of the three parental acts contained within the statute in the year prior to his or her child's death, a finding of abandonment is precluded." Id. Based on this interpretation of R.C. 2125.02(G)(3), we concluded that the father in Turner had not abandoned his child when there was evidence that he had some communication with his son within one year of his son's death, even though the father had failed to pay any support for his son and had never taken any steps toward formally acknowledging the child as his son.
 {¶ 22} More recently, the Tenth District adopted our interpretation of R.C. 2125.02(G)(3) and stated that "the estate and [the mother] had the burden of proving that [the father] failed to take all three actions described in the statute in order to establish abandonment, and evidence that [the father] took any of the actions, if believed, would preclude a finding of *Page 7 
abandonment." In re Estate of Barnett-Clardy, Franklin App. Nos. 07AP-55, 07AP-257, 2007-Ohio-6783, ¶ 15.
 {¶ 23} Lydia urges us to adopt the reasoning of Judge Fain's dissent in Turner, in which he stated, in relevant part:
 {¶ 24} "`To fail' is `to miss attainment: [to] fall short of achievement or realization * * *.' Webster's Third New International Dictionary, at 814. Thus, as the terms are commonly understood and used, to fail to do a thing and to succeed in doing that thing are opposite, mutually exclusive eventualities.
 {¶ 25} "* * *
 {¶ 26} "Pursuant to the plain meaning of `failed,' a parent can be said to have failed to: (1) communicate with the child; (2) care for the child; and (3) provide for the maintenance or support of the child if, and only if, the parent has not succeeded in: (1) communicating with the child; (2) caring for the child; and (3) providing for the maintenance or support of the child. In other words, a person fails to do A, B and C, if, and only if, he does not succeed in doing A, B, and C.
 {¶ 27} "For example, if a parent tells a child that he will be grounded if he fails to take the driver's license test and pass it within the next month, the child cannot reasonably expect to avoid being grounded merely by taking the test, without passing it.
 {¶ 28} "Where A, B, and C are communicating with his son, caring for his son, and providing legally required maintenance or support for his son, respectively, Hunter cannot be said to have succeeded in doing A, B, and C, because he has failed to do B. Therefore, he has failed to do A, B, and C. *Page 8 
 {¶ 29} "I would hold that the trial court correctly determined that Hunter abandoned his son, pursuant to R.C. 2125.02(G)(3); therefore, I would affirm the judgment of the trial court."
 {¶ 30} We see no reason to interpret R.C. 2105.10(A)(1) differently than our interpretation of R.C. 2125.02(G)(3) in Turner. The General Assembly can and has used disjunctive language when only one of several actions must be established. As noted by the probate court, R.C. 3107.07, which governs when consent is required for adoption, provides that consent to adoption is not required of:
 {¶ 31} "(A) A parent of a minor, when it is alleged in the adoption petition and the court finds after proper service of notice and hearing, that the parent has failed without justifiable cause to communicate with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner." (Emphasis added.) R.C. 3107.07(A).
 {¶ 32} Under R.C. 3107.07, consent is not required when the parent has either failed to communicate or failed to provide maintenance and support. If the General Assembly intended that "abandonment" be established by the failure to perform any one of the three parental duties set forth in R.C. 2105.10(A) and R.C. 2125.02(G)(3), it could have used disjunctive language similar to R.C. 3107.07.
 {¶ 33} The General Assembly's use of the conjunctive in R.C. 2105.10(A)(1) and R.C. 2125.02(G)(3) suggests that all three conditions must be met to constitute abandonment. We therefore conclude, consistent with the majority's reasoning in Turner, that the estate bears the burden of establishing, by a preponderance of the evidence, that the alleged abandoning parent *Page 9 
failed to perform all of the three parental duties under R.C. 2105.10(A)(1). The probate court properly interpreted R.C. 2105.10(A)(1) to mean that, if the parent performs any of the three actions — communicating, caring, or providing for the child's maintenance and support — the parent has not "abandoned" the minor child within the meaning of R.C. 2105.10(A)(1).
 {¶ 34} Here, Kelvin testified that he had paid child support for Shanté in 2006, and the trial court credited his testimony. Based on this evidence, the trial court correctly determined that Kelvin had supported Shanté and, consequently, that he had not abandoned her.
 {¶ 35} Lydia further argues that the trial court erred in concluding that Kelvin's lack of communication with Shanté was justified due to her interference. Considering that Kelvin's support of Shanté within one year of her death precludes a finding of abandonment, we need not address whether Kelvin's lack of communication was justified.
 {¶ 36} Lydia's assignment of error is overruled.
 III {¶ 37} Having overruled the assignment of error, the judgment will be affirmed.
BROGAN, J. and GRADY, J., concur.
Copies mailed to:
John E. Clough John J. Scaccia Hon. Alice O. McCollum *Page 1